UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DANIEL EUGENE MCINTEE,

                Petitioner,                    Case No. 1:09-cv-873

v.                                         Honorable Paul L. Maloney

HUGH WOLFENBARGER,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

       This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted in the Monroe County Circuit Court of first-degree home invasion, being a felon in possession of a firearm and possession of a firearm during the commission of a felony.[1] On April 1, 2004, the trial court sentenced Petitioner as a fourth-offense habitual offender to imprisonment of 21 to 40 years for the home-invasion conviction, 2 to 10 years for the felon-in-possession conviction and 2 years for the felony-firearm conviction. In his *pro se* second-amended petition, Petitioner raises the following six grounds for relief:

      I.      PETITIONER WAS DENIED HIS RIGHT TO A FAIR TRIAL . . . WHEN THE TRIAL COURT REFUSED TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF ENTERING WITHOUT PERMISSION.

---

[1] Petitioner and his co-defendant David Wayne McIntee, Petitioner's cousin, were tried together. Their cases were consolidated for purposes of both trial and appeal, although they had separate case numbers. Their cases were not consolidated in the Michigan Supreme Court.

II.     DEFENDANT WAS DENIED A FAIR TRIAL . . . WHERE THE
        JUDGE WHO PRESIDED OVER THESE PROCEEDINGS WAS
        BIASED AND SUBJECT TO DISQUALIFICATION.

III.    THE DUE PROCESS CLAUSE . . . WAS VIOLATED TO THE
        EXTENT THAT THE STATE FAILED TO SUPPLY THE
        DEFENSE WITH PHOTOGRAPHS AND POLICE REPORTS IN
        VIOLATION OF *BRADY*.

IV.     PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH
        AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF
        TRIAL COUNSEL . . . .

        A.     THERE WERE SEVERAL INSTANCES WHERE
               TRIAL COUNSEL COULD HAVE IMPEACHED
               SEVERAL OF THE PROSECUTION WITNESSES
               WITH THEIR PREVIOUS INCONSISTENT
               STATEMENTS BUT FAILED TO DO SO.

        B.     TRIAL COUNSEL WAS AWARE OF JUDGE
               COSTELLO'S BIAS AGAINST PETITIONER BUT
               FAILED TO MOVE FOR DISQUALIFICATION.

        C.     AFTER DISCOVERING THE SUPPRESSED
               EVIDENCE, TRIAL COUNSEL FAILED TO
               MOVE FOR A CONTINUANCE TO ASSESS THE
               VALUE OF THE SUPPRESSED EVIDENCE.

V.      PETITIONER IS ENTITLED TO RESENTENCING WHERE THE
        TRIAL COURT'S APRIL 24, 2004 AMENDED SENTENCE WAS
        ENTERED WITHOUT JURISDICTION RENDERING IT NULL
        AND VOID.

VI.     PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH
        AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF
        APPELLATE COUNSEL.

(Second Am. Pet. 8-16, docket #17.)

        Respondent has filed an answer to the petition (docket #26) stating that ground one

should be denied because it is noncognizable and meritless, and grounds two through five are

procedurally defaulted.[2]  Notwithstanding Respondent's decision to rely on procedural default as a basis for denying the petition, federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)).  *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).  Accordingly, I have considered each of Petitioner's claims on the merits.  Having done so, and applying the AEDPA standards, I find that the petition is without merit.  I therefore recommend that the petition be denied.

## **Procedural History**

### A.    **Trial Court Proceedings**

The state prosecution arose from an attempted burglary at the home of Deborah Jedryczka and Jason Redmond.  Ms. Jedryczka's two children, Courtney and Blake Wyatt, were alone inside the home at the time of the offense.  In an amended complaint, Petitioner was charged

---

[2]Although Respondent acknowledges that Petitioner raises six grounds for relief, Respondent's answer in opposition to the petition addresses only Petitioner's first five grounds for relief.

with one count of first-degree home invasion, one count of felony-firearm, and one count of felon in possession of a firearm.  (10/14/03 Prelim. Examination Tr., docket #33.)  Petitioner was tried before a jury beginning February 2, 2004, and concluding on February 5, 2004.[3]

Courtney testified that at the time of the events, she was 16 years old and lived at 14836 Briar Hill Road, Ash Township, Monroe County.  (Tr. I, 171.)  On the morning of June 18, 2003, her house was broken into while she and her younger brother Blake were there alone.  (*Id.* at 171-172.)  As Courtney was getting dressed, Blake came upstairs and told her to come quick that there was someone knocking on the door, he did not know who it was and he wanted Courtney to come downstairs.  (*Id.* at 172.)  When she got downstairs she heard someone pounding on the living room door.  (*Id.* at 174, 176.)  When the pounding stopped Courtney and Blake went into the kitchen where they looked out a small gap in a window curtain.  (*Id.* at 177.)  Courtney saw a gray Pontiac, heard it shut off and then saw another man get out of the car.  (*Id.*)  The two men started talking.  (*Id.*)  She could see the men.  (*Id.*)  One was heavyset and was wearing a black sleeveless, muscle-type shirt, and black shorts.  (*Id.*)  The second man was thinner and was wearing a blue t-shirt with a left breast pocket, blue jeans and distinctive octagonal-shaped glasses.  (*Id.* at 177-78.)  She did not recognize either man.  (*Id.* at 178.)

After she saw the two men talking, she told her brother to go upstairs to his bedroom and look out the window.  (*Id.* at 178.)  She got the telephone and ran upstairs after him.  (*Id.*)  As she got to the top of the stairs she heard the downstairs north kitchen door slamming against the

---

[3]The trial transcript will be referred to as follows:
"Tr. I" - Trial Transcript Volume I, February 2, 2004 (docket #35)
"Tr. II" - Trial Transcript Volume II, February 3, 2004 (docket #36)
"Tr. III" - Trial Transcript Volume III, February 4, 2004 (docket #37)
"Tr. IV" - Trial Transcript Volume IV, February 5, 2004 (docket #38).

wall. (*Id.* at 179.)  The door had a wreath with jingle bells on it so she could hear the sound of the jingle bells and realized the door had been opened.  (*Id.*)

After she heard the door slam open she went into her room and called her grandmother. (*Id.* at 180.)  She told her grandmother that the house was getting broken into, she was scared to death and her grandmother needed to send someone quickly. (*Id.*)  She then went into her brother's room and she and her brother hid under the bed. (*Id.*)  She could hear sounds of drawers opening and shutting and the sound of things being rifled through. (*Id.* at 181.)  She could not tell what rooms the men were in, but at one point she knew they were in the master bedroom because that room is directly below her brother's bedroom. (*Id.*)  She heard two sets of footsteps run up the stairwell. (*Id.* at 182.)  They went through her bedroom and the north bedroom and then Blake's bedroom. (*Id.*)  Eventually she heard one of the men say: "Let's get out of here," and they went back downstairs. (*Id.* at 184.)  While Courtney and Blake were hiding under the bed in Blake's room one of the men came in but she did not see his feet. (*Id.* at 185.)  After the men went downstairs, she and Blake stayed under the bed. (*Id.* at 186.)  Eventually she heard the voice of her Uncle Randy downstairs saying: "Get down on the ground," and she heard a gunshot fired. (*Id.*)

After she heard her Uncle Randy's voice, her brother got out from under the bed, grabbed a baseball bat and lead pipe and ran downstairs. (*Id.* at 187.)  She followed after him and when she got downstairs she saw a comforter stacked with their belongings, including guns and jewelry, jammed against the kitchen screen door. (*Id.* at 187-89.)  She pulled it out of the way of the door. (*Id.* at 189.)  She went out onto the porch and saw her uncle and grandfather standing over the two men who were laying on the ground held at gunpoint. (*Id.* at 190.)  Her uncle told her to call the police. (*Id.* at 191.)  Courtney called 911 and the recording of that call was played for the jury.

- 5 -

(*Id.* at 204-205.)  The pertinent parts of the conversation between Courtney and the 911 Operator are as follows:

| | |
|---|---|
| Courtney Wyatt: | Hi.  Hurry up.  We just got broken into, and the guys are right here.  Please, we need help. |
| | * * * |
| Dispatcher: | And the people that did it are still there? |
| Courtney Wyatt: | Yes, they're right here. |
| | * * * |
| Dispatcher: | Okay.  Do you know these people? |
| Courtney Wyatt: | No, I don't, but please hurry. |
| Dispatcher: | Okay. |

(*Id.* at 205.)

Courtney identified the items that were piled on the comforter that was jammed against the kitchen screen door, including the jewelry items taken from her room, her brother's pellet gun, a large stack of guns, a couple of glass jars filled with coins and a camera.  (*Id.* at 198-201, 213.)  Courtney identified the Petitioner and his co-defendant, David McIntee, Petitioner's cousin, as the men she saw being held at gunpoint by her grandfather and uncle.  (*Id.* at 193.)

Blake, who was 13 at the time of the incident, testified consistently with Courtney regarding the events leading up to the break-in, the break-in and the arrival of their uncle and grandfather.  (*Id.* at 244-58, 282.)  Blake testified that when the men came up to his room, he saw a pair of shoes when he peeked out from under the bed.  (*Id.* at 257.)  On cross-examination, Blake testified that he saw two pairs of shoes while he was hiding underneath the bed.  (*Id.* at 284.)  Blake also testified that when he got outside, he talked to his uncle and grandfather, and then his uncle told

- 6 -

Courtney to call 911.  (*Id*. at 259.)  Courtney called 911 one time and later Blake made two calls to

911.  (*Id*.)  The tape of Blake's 911 calls was played for the jury.  (*Id*. at 261-70.)  The pertinent

parts of the conversations between Blake and the 911 Operator are as follows:

Dispatcher:     Can you tell me what kind of car it is?

Blake Wyatt:   It's a gray Pontiac.

* * *

Dispatcher:     There's two people that broke in?

Blake Wyatt:   No, there were more than two, but there's only two left.  The
others got away.

Dispatcher:     Okay.  The ones that are there, can you tell me what kind of
clothes they're wearing?

Blake Wyatt:   Okay.  One's kind of fat, and he's got a black -- a black
muscle shirt -- black sleeveless.

Dispatcher:     Um-hum.

Blake Wyatt:   Black shorts, white socks, and white Reeboks.  And the other
one's got on a blue tee-shirt, light blue jeans, and red-and-
black Nike shirt.  And the fat one's got black hair and so does
the skinny one, and both of them have glasses, and they both
have a bunch of tattoos.

Dispatcher:     Glasses and tattoos, okay.

* * *

Blake Wyatt:   The fat one's white and the other one's kind of
tanned.

* * *

Dispatcher:     How many more were there other than these two, do
you know?

- 7 -

> Blake Wyatt:   I don't know.  For sure, one black guy, 'cause he was talking
> like a black guy.  There was -- I don't know -- more than two.
>
> \*   \*   \*
>
> Dispatcher:   Do you know anything about who the other person
> might have been or where they went?
>
> Blake Wyatt:   No.  They-- They're saying they won't tell.  They're saying
> that their friend set it up and stuff.

(*Id.*)

Blake identified Petitioner and David McIntee as the men who were at his house on June 18, 2003. (*Id.* at 271.)

Randolph Jedryczka, referred to as Uncle Randy by Courtney and Blake, testified that when he arrived at the house he saw David McIntee running for the north door of the house.  (Tr. II, 17. ) Randolph got out of his vehicle and ran toward the house.  (*Id.* at 20.)  Once he got to the house, he saw David McIntee in the living room of the house.  (*Id.* at 20, 23.)  Randolph eventually went into the house and saw the comforter with the guns and jewelry laying on top of it.  (*Id.* at 25.) When Randolph exited the house he saw his father holding Petitioner and David McIntee at gunpoint outside the house.  (*Id.* at 26-27.)  Randolph told the men to get on the ground and fired one round from his pistol into the air.  (*Id.* at 28.)  Randolph and his father were yelling at the men on the ground.  (*Id.* at 32.)  At some point, one of the men claimed that they had not been in the house and later said that two other men were involved and that the other two men ran out the other door of the house.  (*Id.* at 34, 47.)

Adolph Jedryczka, Randolph's father and Courtney and Blake's grandfather, testified consistently with his son.  When he arrived at his daughter's house he saw David McIntee run toward the house.  (*Id.* at 65-67.)  He went to the west door of the house and when he got there, he

saw Petitioner come out the door . (*Id.* at 67-68.)  Petitioner had a surprised look on his face because Adolph was holding a gun on him. (*Id.* at 67.)  He heard David McIntee say that they came to the house because they needed money. (*Id.* at 72.)

Hazel Jedryczka, Adolph's wife and Courtney and Blake's grandmother, testified that she received a telephone call from Courtney telling her to send someone quickly because someone was breaking into the house. (*Id.* at 88.)  Hazel eventually went to the house and saw two men on the ground with her husband and son standing near them, watching them. (*Id.* at 93.)  She did not want to get involved so she left the scene. (*Id.* at 94.)

Deborah Jedryczka, Courtney and Blake's mother, testified that she was at a neighbor's house when most of the events took place, but when she came back home she saw her daughter and son, her parents, sister Donna, Petitioner and David McIntee, and several police officers. (*Id.* at 101.)  When she saw them, Petitioner and David McIntee were in the backseat of a police car. (*Id.* at 101-102.)  After she had a chance to get into her house, she went into her bedroom and saw that dresser drawers had been pulled out and the contents dumped out, the bed covering was off the bed and a pillow cover was removed. (*Id.* at 103.)  The gun cabinets were open and all 15 of the weapons stored in the cabinets were gone. (*Id.* at 104, 107.)  She saw the comforter on which all their belongings were laying on the kitchen floor just inside the door. (*Id.* at 110.)  She also saw her pillow case which contained items of jewelry that had been taken from her dresser. (*Id.* at 112.)  She saw that the kitchen door had broken open and the door jamb was damaged. (*Id.* at 120-21.)

Jason Redmond, Deborah's fiancé, testified consistently with Deborah about the appearance of their home, the items that were found laying on the comforter in the kitchen by the door and the condition of the kitchen door. (*Id.* at 128-31.)

Sergeant Henry Ruyan of the Carleton Police Department was the first responding officer. (*Id.* at 146.) He knew the Jedryczka family. (*Id.* at 147.) When he arrived at the scene he saw Adolph, Randy, Hazel, Donna and two young children. (*Id.*) He also saw Petitioner and David McIntee sprawled on the ground spread eagle. (*Id.*) His role was to "hold down" the scene until the Monroe County Sheriff's Department got there. (*Id.* at 146.) He asked Randy and Adolph to put away their weapons, patted down Petitioner and David McIntee, handcuffed them together and placed them in the backseat of his patrol car. (*Id.* at 148.) Shortly after Petitioner and David McIntee were place in Runyan's car, the sheriff's deputies arrived. (*Id.*) He was asked to walk the perimeter of the yard, which he did with Donna Jedryczka, to see if there was any evidence of another person having been involved in the incident and escaped. (*Id.* at 149.) He found nothing to suggest that there was somebody else involved. (*Id.*)

Deputy Bradley Bentley of the Monroe County Sheriff's Department testified that after meeting with Sergeant Runyan, he learned that the two alleged perpetrators were in the backseat of Runyan's car and the people standing outside were the homeowners. (*Id.* at 159-60.) Because no one had searched the house at that point, Bentley and Sergeant Goodnough did a sweep of the home looking for anyone else who might be inside the home. (*Id.* at 160.) In addition to looking for additional persons in the home, Deputy Bentley saw that there was a bed covering on the ground with guns and jewelry laying on it. (*Id.* at 161.) When Deputy Bentley went upstairs he noted that the bedrooms had been ransacked with dresser drawers dumped on the bed. (*Id.* at 162.)

- 10 -

Deputy Bentley interviewed people on scene and then walked Detective Davison through the house, taking an inventory of the items that were on the bed covering on the floor.  (*Id.* at 163.)  He did not see any footprints on the door or any pry marks along the door jamb.  (*Id.* at 166.)

Detective Davison testified consistently with Deputy Bentley regarding the door and door jamb and the items on top of the bed covering.  (*Id.* at 192-195.)

After the people rested, Petitioner's counsel, William A. Garrett, and David McIntee's counsel, James F. Bartlett, gave their opening statements and called several witnesses, including Petitioner.  (*Id.* at 241-47.)  Petitioner testified that on June 18, 2003,  he was supposed to be going to look at used cars at the Detroit Auto Auction, but the car in which he was riding, which belonged to his cousin David, ended up having trouble.  (*Id.* at 266-73.)  They stopped at the Jedryczka's house to get water for the car because the road on which they were traveling did not have a sufficient shoulder for them to pull out of traffic and park.  (*Id.* at 271-72.)  After they arrived at the Jedryczka's house, Petitioner walked to the door and knocked.  (*Id.* at 274.)  When no one answered he was going to give up, but then, because he did not know if the car would continue to work without some water, he turned and knocked again.  (*Id.*)  Just after he finished knocking Randolph and Adolph pulled up shooting their guns and ordered Petitioner and David McIntee to the ground at gun point.  (*Id.* at 274-75.)

At the start of the third day of trial, Mr. Bartlett brought up the issue of evidence that had not been produced to the defense.

> MR. BARTLETT:      Your Honor, I had an opportunity to meet with Detective Davison not too long after we were here yesterday. Admittedly, Detective Davison did produce to me three photographs of the interior of this motor vehicle, a new copy of the police report which has some additional -- well, an additional page, I should say, as well as an inventory sheet.

- 11 -

There are all items that we hadn't -- I had filed demand for discovery back in Decem -- December. Now that the prosecution has rested their case and Mr. Garrett's rested his case, it[']s now that these things have become available. I think you recall testimony that there were pictures that had been taken, and I think you heard testimony regarding a bullet that was found on the scene that wasn't introduced into evidence either.

\* \* \*

MR. BARTLETT:   I can't swear to this Honorable Court this morning that suddenly these items shed a new light on the whole case and are going to make us change our tactic and everything else, because I've only had a chance to digest them for -- since yesterday. I'm not asking for an extension, but I would ask that either this charge be dismissed for the prosecutor's failure to comply with the discovery demand, or an instruction to the jury regarding these items that we have just found out about, including the testimony of possibly Troy Goodnough, indicating that this evidence should be weighed in favor of the defendants -- or could be weighed in favor of the defendant as opposed to the prosecution.

So that's my request this morning. . . .

THE COURT:   Response?

MR. SIMMS:   Well, first of all, as defense counsel said, I gave the defense everything I had when I had it. Now, to these specific items. The first items I believe are three photographs of the interior of the motor vehicle. I said all along to defense counsel: Tell me what is inside the car this is pertinent -- that is inside the passenger compartment, because as Your Honor has already seen, we had a photograph of the car itself and we had a photograph of the car itself with the trunk open and the -- some of the things moved so that the toy gun could be seen.

\* \* \*

When we look at these photographs, we see empty either water or Pepsi or pop bottle, hairbrush -- I don't know if it's a cell phone -- it's something that's got a -- some sort of a little electronic gizmo that has a wire coming from it. It must

- 12 -

not be a cell phone, 'cause otherwise these poor fellows would have used it to call somebody.

We have another photograph behind what appears to be one of the front seats. We see the bottom of a shoe, some either newspaper or other sort of advertising material. The third picture is a close up of that electronic thing. It says "Cobra" on it, which then would suggest that it's probably maybe a radar-type detector-type item. I'm not saying that's what it is; I'm just guessing that's what it is. Also a pill bottle which belongs to somebody else.

Now, I respectfully -- and also there's a picture that looks like the bottom of another shoe. I believe that's what that is, sort of in front of the right -- the front passenger seat.

I respectfully submit that these things don't change the tenor of this case one whit. I also suggest that these are actually two separate -- now, as far as the property sheet goes -- there are actually two separate property sheets. These [sic] is the initial one that has like 30 things on it. You have a partial copy of that, because that refers to the things that belong to either the Jedryczkas or Jason Redmond. The remainder of that sheet that wasn't admitted as a document, because I saw frankly no relevance to it, was the leftover thi -- some of the leftover things from his car. I believe there are things to the effect of like the red hat that counsel asked about, the toy gun, a couple of other things, which I frankly don't recall, and I respectfully submit that when you look at this separate property sheet, you're going to find the items on there are remarkably similar to the items from the main property sheet, if you will. It appears that there's more than one.

\* \* \*

And so, there -- and so, therefore, number one, I have given up everything I had as soon as I had it. Two, this really is much ado about nothing in the sense that there's not one even semi-important item of evidence that's been missed, but if it were -- if it were needed, I would say -- I would probably agree that it was there, depending on what it was. And if they would just tell -- in fact, I've been begging them to tell me for a couple days: What is it that's in the car? Jeepers creepers, these fellows out to know what was in their own car. Tell me

what was in there that you need to have admitted or stipulated to or something.

And so, therefore, I respectfully submit that the motion is not well-taken. I respectfully submit that -- I respectfully submit that because of the fact that re -- without regard to the timing of when certain things were found or discovered -- in fact, I think -- without regard to the timing when certain things were actually produced, my request to the sheriff was: Give me the pictures. I got the pictures; I gave them up. Now there are some more here. To me, frankly, I guess that makes me naive and stupid and not a very experienced attorney, but to me the pertinent point was that none of the Jedryczkas or Mr. Redmond's property was ever in this -- these fellows car.

And we made that clear all the way through. If there's another point of -- if there is some other little nugget of gold here, tell me what it is and we'll go from there.

MR. BARTLETT:     Well, Mr. Simms is asking me to discuss this nugget of gold without having had the opportunity to review these things. He's asking me to define something that obviously I did not have access to. The person who best had access was Detective Davison, and they were in the best position to produce these types of things.

(Tr. III, 4-11.)

After some discussion between the Court and Detective Davison, the Court asked:

THE COURT:        Well, what does the defense make out of these three photos.

MR. BARTLETT:     They appear to be photos of the inside of the vehicle. I spoke with my client about them. Although some of the items look familiar to him, not all of them do. The reason why that might be pertinent, and I know that it was only a plastic gun, but the plastic gun did not -- he was not aware of that being in the car either. We had Detective Davison saying that it was there. We had Detective Bentley, who supposedly looked through the car -- at least I believe that was his testimony. If I'm screwing that up, I apologize. But I know that he had -- did the tow inventory or whatnot, and didn't -- had looked in the trunk, said the one trunk photo looked

- 14 -

familiar, but he never saw that plastic gun before in his life, or something to that effect.

And so --

THE COURT:       So you're suggesting someone planted it?   It's possible someone planted it?

MR. BARTLETT:    That's the possibility, Your Honor.  And, again, I don't know.

THE COURT:       I mean, planting a toy gun would do what?

MR. BARTLETT:    Finding a toy gun -- there's some question -- I know that Detective Davison says it's a toy gun.  My client contends that it does not look like a toy gun, at least in our photocopied pictures.  I know that we've looked at the other one.  Does it look like a toy gun?  I couldn't say.  So I don't -- I don't know what impact it could have had, had we had these photos earlier.

(*Id.* at 22-23.)

Ultimately, the Court asked counsel how much time they might need to consider the items of evidence.  (*Id.* at 23.)  After conferring together, defense counsel asked for an additional thirty minutes.  (*Id.* at 24.)  The Court stated the following:

THE COURT:       Okay.  First of all, let me say this.  According to case law -- and I recognize this as a federal case -- well, actually it's a U.S. Supreme Court case -- <u>Arizona</u> versus <u>Youngblood</u> reported at 488 U.S. Reports 51, a 1988 decision, and it's a very good decision because it states the obvious and good logic that failure of the state to disclose certain types of evidence -- it doesn't matter if it was in good or bad faith -- it's irrelevant to any claim that there's some type of loss of evidence.  Here there was a delay in the evidence being produced; however, the issue has to be whether or not it's materially exculpatory evidence.

I don't see how this is materially exculpatory evidence.  No one has even made that argument.  The argument has been there was a toy gun in the trunk of the car.  That's already been admitted as an exhibit.  And one of the suggestions is,

- 15 -

is that someone planted it there.  They might have planted other things in the car.  But everything else in the car is of a non-criminal nature so I don't accept that.

I would find that, first of all, we are giving defense counsel an opportunity to review this newly received and potential evidence.  We don't even know if anyone wants it to come in yet.  I'm hoping that counsel can tell me that after they've had their time to pour over this. . .

(*Id.* at 24-25.)

The Court then asked defense counsel if either would like to question Detective Davison. (*Id.* at 26.)  Neither did.  (*Id.* at 27.)  After defense counsel conferred, the Court stated;

THE COURT:          What do you have to report?

MR. BARTLETT:    Your Honor, you had allowed Mr. Garrett and myself to recess to discuss the photographs as to whether or not we consider them to be -- or we had any idea whether or not they could be exculpatory.  In reviewing these I still -- I can't represent to this Court that I know what they are or are not. I don't have anything to put forth to say that they are at this point.  Does that mean, if I had them weeks ago, that I would be giving the same answer right now?  I can't swear to that, and that's the best I can do in regards to that.

(*Id.* at 27.)

After additional argument by defense counsel and the prosecutor, the Court concluded that the case would not be dismissed as a result of the late-disclosed items, nor would the Court give the missing witness instruction requested by defense counsel, because it was inapplicable and the late-disclosed items were not missing, but were present and could be shown to the jury.  (*Id.* at 32-33.)  The Court suggested that the People reopen their proofs and have Detective Davison testify regarding the missing items, but asked defense counsel how they wished to proceed.  (*Id.* at

33.)  Defense counsel agreed with the Court's suggestion.  (*Id.* at 35.)  The three photos were introduced into evidence during Detective Davison's testimony in rebuttal.  (*Id.* at 35.)

Testifying in rebuttal, Detective Davison stated that the intersection to the Jedryczka's home is eight-tenths of a mile from the Detroit Auto Auction and that the Will-Carelton Road, has wide shoulders on each side sufficient for a car to pull-over and park outside of the lane of moving traffic.  (*Id.* at 63-64, 65.)  Detective Davison also testified that Petitioner never told him that the car was having problems and if Petitioner testified otherwise, he was lying.  (*Id.* at 67.)

At the conclusion of trial, on February 5, 2004, the jury found Petitioner guilty of first-degree home invasion, possession of a weapon or firearm by a felon and possession of a weapon or firearm during the commission of a felony. (Tr. IV, 5-7.)  On April 1, 2004, Petitioner was sentenced to serve a prison term of 260 to 480 months for the first degree home invasion conviction, 24 to 120 months for the felon in possession of a firearm conviction and 24 months for the possession of a firearm during the commission of a felony conviction.  The trial court ordered that these sentences shall run consecutive to Petitioner's parole term and shall run consecutive to each other.  (Sentencing Transcript (S. Tr.) 50, docket #39.)

**B.**     **Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on November 12, 2004, raised the following two grounds for relief:

I.     THE DEFENDANT IS ENTITLED TO A NEW TRIAL WHEN HIS REQUEST FOR CJI2d 25.4 ON THE LESSER INCLUDED OFFENSE OF ENTERING WITHOUT THE OWNER'S PERMISSION WAS DENIED WHEN INTENT WAS A DISPUTED ISSUE AT TRIAL.

II.    THE SENTENCE IMPOSED BY THE TRIAL COURT WAS DISPROPORTIONATE TO THE OFFENSE AND THIS OFFENDER.

(*See* Def.-Appellant's Br. on Appeal, docket #50.)  By unpublished *per curiam* opinion issued on October 11, 2005, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 10/11/05 Mich. Ct. App. Opinion (MCOA Op.), docket #50.)

On October 21, 2005, Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same claims raised before and rejected by the Michigan Court of Appeals.  By order entered February 27, 2006, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* 2/27/06 Mich. Ord., docket #51.)

### C.    Post-conviction relief

Petitioner filed a motion to disqualify on May 29, 2007, and a motion for relief from judgment on May 30, 2007.  The court denied Petitioner's motion to disqualify on August 22, 2007, and his motion for relief from judgment on April 1, 2008.  Petitioner appealed the denial of his motion for relief from judgment to the Michigan Court of Appeals.  The court of appeals denied his delayed application for leave to appeal on June 9, 2009.  Petitioner subsequently sought leave to appeal in the Michigan Supreme Court, which denied his application on February 26, 2010.

**Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:   "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  The Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  "In *Greene*, the Court clarified that state courts must follow clearly established law as it existed 'at the time of the state-court adjudication on the merits.'"  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014).  "That is, under 28 U.S.C. § 2254(d), 'clearly established Federal law' is the law at the time the original decision was made, not as [the Sixth Circuit had previously held], the law 'before the conviction became final.'"  *Miller*, 642 F.3d at 644 (quoting *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth by the Supreme Court, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–406). The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011)).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Richter*, 131 S. Ct. at 784; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. 1096. Where other circumstances

indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Richter*, 131 S. Ct. at 785 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.      Lesser Included Offense Instruction: Ground 1.

Petitioner alleges that the trial court violated his right to a fair trial when it refused to give an instruction on the lesser included offense of entering without the owner's permission. Petitioner alleges that this instruction should have been given by the trial court as the criminal intent required for a conviction of first-degree home invasion was in dispute, but the trial court refused. The Michigan Court of Appeals rejected Petitioner's claim, stating that

the requested lesser offense instruction was inappropriate as it was not supported by a rational view of the evidence. The element distinguishing first-degree home invasion from entering without permission is whether the defendant possessed the intent to commit "a felony, larceny, or assault" upon entry. The undisputed evidence established that the men who entered the complainants' home intended to commit a larceny. However, defendants denied ever entering the home. Therefore, defendants' intentions upon entering the home were not in dispute and the trial court properly declined to give the requested instruction.

(10/11/05 MCOA slip op. at 3 (citations omitted).)

The Sixth Circuit Court of Appeals, sitting en banc, has held that the failure to give an instruction on a lesser-included offense, even when requested by counsel, is not of the "character or magnitude which should be cognizable on collateral attack." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc). The *Bagby* Court held that failure to instruct on lesser-included offenses in a noncapital case is reviewable in a habeas corpus action only if the failure results in a miscarriage of justice or constitutes an omission inconsistent with the rudimentary demands of fair procedure. *Id.*; *accord Tegeler v. Renico*, 253 F. App'x 521, 524 (6th Cir. 2007); *Todd v. Stegal*, 40 F. App'x 25, 28-29 (6th Cir. 2002); *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002); *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001); *Samu v. Elo*, 14 F. App'x 477, 479 (6th Cir. 2001); *Williams v. Hofbauer*, 3 F. App'x 456, 458 (6th Cir. 2001). Shortly after the Sixth Circuit decision in *Bagby*, the Supreme Court emphasized that the fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983)). Instead, the only question on habeas review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 14 (1973)), *cited in Todd*, 40 F. App'x at 29. Here, there is no miscarriage of justice or fundamental defect in due process. There was ample evidence to support the jury's decision to believe that Petitioner and David

McIntee broke into the Jedryczka/Redmond home with the intent to commit a larceny and to disbelieve Petitioner's testimony that he remained outside the home knocking when he saw Randolph and Adolph drive up.   Courtney and Blake saw the two men outside the house immediately prior to hearing the door broken open and Randolph and Adolph later stopped both men as they walked out of the house.  (*See* Tr. I, 177-78, 244-52; Tr. II, 20-28, 65-68.)  Additionally, there was ample evidence to establish that while in the house, Petitioner and David McIntee ransacked it and collected items on a bed covering that lay on the floor near a door from which they, and the Jedryczka's/Redmond's belongings, could exit.  (*See* Tr. I, 181-84, 187-89, 253-57, 258, 282; Tr. II, 110, 128-31, 161, 192-95.) Furthermore, no clearly established Supreme Court authority requires lesser-included offense instructions in non-capital cases.  Thus, under the AEDPA, 28 U.S.C. § 2254(d)(1), this claim is not a basis for habeas relief.  *Todd*, 40 F. App'x at 28 (citing *Estelle*, 502 U.S. at 71-72).

II.      Judicial Bias: Ground 2

Petitioner alleges that he was denied a fair trial because the presiding judge was biased and subject to disqualification.  Petitioner contends that after his trial, he learned that the presiding judge had participated in a Sheriff's Department Employee Recognition dinner and during the dinner two witnesses who testified at Petitioner's trial were honored.  Petitioner contends that in ruling on his motion for new trial, the judge labeled the defense theory as "smoke and mirrors," "a joke," and "insulting."  Additionally, at sentencing the judge "expressed his hope that Petitioner 'never walk[ ] the streets of Michigan again.'" (Second Am. Pet., docket #17, Page 9.)

Due process demands that the judge be unbiased. *In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course

requires an absence of *actual* bias in the trial of cases." (emphasis added)). A judge can and should be disqualified for bias, a likelihood of bias or even an appearance of bias. *See Ungar v. Sarafite*, 376 U.S. 575, 588 (1964); *Railey v. Webb*, 540 F.3d 393 (6th Cir. 2008). "But, it is also clear that judicial disqualification based on a likelihood or an appearance of bias is not always of constitutional significance; indeed, 'most matters relating to judicial disqualification d[o] not rise to a constitutional level.'" *Railey*, 540 F.3d at 400 (citing *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 702 (1948); *see also Tumey v. Ohio*, 273 U.S. 510, 523 (1927) ("All questions of judicial qualification may not involve constitutional validity.").)

The Supreme Court has held in two types of cases that something less than actual bias violates constitutional due process: (1) cases that the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey*, 273 U.S. at 523 (subsequently expanded to include even indirect pecuniary interest); and (2) certain contempt cases, for instance, those in which the "judge becomes personally embroiled with the contemnor," *Murchison*, 349 U.S. at 141 (subsequently clarified to involve cases in which the judge suffers a severe personal insult or attack from the contemnor). "The Court has also acknowledged four types of cases that, although they present prudent grounds for disqualification as a matter of common sense, ethics, or 'legislative discretion,' generally do not rise to a constitutional level - 'matters of [1] kinship, [2] personal bias, [3] state policy, [and][4] remoteness of interest.'" *Railey*, 540 F.3d at 400 (quoting *Tumey*, 273 U.S. 523); *accord Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820 (1986).

Petitioner filed four post-conviction motions: a motion for relief from judgment, a motion to disqualify the trial judge, a motion for an evidentiary hearing and a motion to appoint counsel. Petitioner's motion for relief from judgment was held in abeyance pending a determination

on Petitioner's motion to disqualify.  Petitioner's motion to appoint counsel was granted and counsel represented Petitioner throughout the disqualification proceedings.

On August 22, 2007, after hearing counsel's argument and the testimony of witnesses, including Petitioner, the trial judge denied Petitioner's motion to disqualify.  (8/22/07 Mot. to Disqualify Hr'g Tr., docket #41.)   Thereafter, pursuant to MICH. CT. R. 2.003(c)(3), Petitioner requested that his motion to disqualify be referred to the chief judge of the Monroe County Circuit Court.  The chief judge denied Petitioner's motion on November 16, 2007, and remanded the case to the trial judge for a decision on Petitioner's motion for relief from judgment. (11/16/07 Mot. Hr'g on Def.'s Mot. to Recuse Judge Costello Tr., docket #43.)   The chief judge considered each of Petitioner's arguments and denied his motion stating:

> The first issue deals with the Defendant citing an alleged statement that was made by Judge Costello at the Monroe County Sheriff's Department banquet. However, there's no evidence that the Judge actually made such a statement, and even if he did, saying that someone will be dealt with to the full extent of the law could mean anything, and does not show actual bias or prejudice on -- on his part. But again, I repeat, there's no evidence that such a statement was actually made.
>
> The -- the next argument deals with a number of evidentiary issues that the Court ruled on over objection.
>
> As -- as a matter of law rulings for or against a party, even if erroneous, do not show bias or prejudice or require disqualification of a judge.
>
> If they were erroneous then the Defendant should have raised them on appeal. But furthermore, I don't find them to be erroneous or -- or to such a -- a -- and if any of them are they were harmless error relative to the outcome of this trial.
>
> There -- there is -- apparently there was -- and I don't know that you've actually raised that in here, but apparently it's been raised today, there was some discussion back and forth with Defense Counsel and the Court over -- over issues and rulings in the trial, and again, that certainly does not show personal bias or prejudice against the Defendant just because the -- the Court and Defense Counsel may have had a disagreement over certain issues.

There's a heavy presumption of judicial impartiality, and the Defendant has the burden of overcoming that presumption, and -- and he has not done so.  There's no evidence of bias, prejudice or partiality on Judge Costello's part, . . .

. . . for all those reasons I am denying the -- the motion to disqualify Judge Costello, and this case is remanded back to him for a decision on the motion for relief from judgment under 6.500.

(*Id.*)

The circumstances of this case do not support a finding that there was a violation of Petitioner's constitutional rights.  Although the trial judge initially ruled upon Petitioner's motion to disqualify, Petitioner sought review of that ruling to the chief judge.  After undertaking *de novo* review, the chief judge also denied Petitioner's motion.

Petitioner makes no allegation that the trial judge had a direct, personal, substantial or pecuniary interest in reaching a particular conclusion.  *Tumey*, 273 U.S. at 523.  Additionally, the transcripts of the pretrial proceedings, the trial itself and sentencing do not indicated that the trial judge became personally embroiled with Petitioner.  *Murchison*, 349 U.S. at 141.  Therefore, the state court's findings that the trial judge should not be disqualified was not objectively unreasonable and did not result in a decision that was contrary to clearly established federal law as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1).

III.    Brady Violation: Ground 3.

In his third ground for relief, Petitioner alleges that the prosecutor improperly suppressed information in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Specifically, Petitioner argues that the prosecutor failed to supply photographs and a police-generated property list.

- 26 -

In ruling on the motion for relief from judgment, the trial judge adopted the prosecutor's arguments regarding the probative value of the allegedly suppressed information.  (*See* 4/1/06 Ord. Den. Mot. for Relief from J., docket #47.)  The prosecutor argued as follows:

> The photographs and the property list were not intentionally withheld by the prosecution.  Further[,] the Defendant cannot show any value of the evidence to his case.  The photographs were of the interior of the [D]efendant's motor vehicle.  There is nothing in those pictures that is exculpatory or relevant.  The pictures show the following items inside the vehicle: a toy gun, a water bottle, a hair brush, maybe a cell phone, a shoe, a newspaper, [and] a pill bottle.  None of those items have any bearing on the case.
>
> The Defendant also received a property sheet from the prosecution after the trial started.  The property sheet was a list of evidence seized from the Defendant['s] vehicle.  Again, there was nothing exculpatory or relevant to the case contained on the property sheet.
>
> The Defendant cannot show that he was prejudice[d] by the late disclosure of the property sheet or the three photographs[,] [s]ince the evidence has no bearing on the Defendant's innocence or guilt there is no actual prejudice.

(People's Resp. to Def.'s Mot. for Relief from J., docket #48.)  Moreover, the trial judge specifically concluded that "Defendant does not claim that his attorney did not have an opportunity to review the evidence but rather that he did not have sufficient time to review the evidence."  (4/1/08 Ord. Den. Mot. for Relief from J., docket #47.)

Petitioner is unable to establish a violation of his federal due process rights.  Under *Brady*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.* at 87.  The Supreme Court has held that "[t]here are three components of a true *Brady* violation:  [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S.

- 27 -

263, 281-82 (1999).  Prejudice and materiality are established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.* at 281 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Cone v. Bell*, 556 U.S. 449, 469-70 (2009).  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Bagley*, 473 U.S. at 682.

Even if Petitioner could show that the State willfully or inadvertently suppressed these items of evidence, Petitioner cannot show that the three photographs of the interior of David McIntee's vehicle and the one-page property list were favorable to him nor can he show that but for the late disclosure of evidence, there is a reasonable probability that the results of the proceedings would have been different.  As evidenced by the lengthy passages from the trial proceedings set forth above, the trial judge offered defense counsel every opportunity to review the late-disclosed evidence for as long as they felt necessary and to set forth any basis or theory to show how the evidence might have worked to Petitioner or David McIntee's benefit had it not been disclosed so late in the trial.  Although counsel refused to affirmatively state that the late-disclosed evidence did not have any impact on the trial, they could not come up with any theories to suggest how the late-disclosed evidence *could* have impacted the  trial.  Indeed Mr. Bartlett could only equivocate, stating:

> Your Honor, you had allowed Mr. Garrett and myself to recess to discuss the photographs as to whether or not we consider them to be -- or we had any idea whether or not they could be exculpatory.  In reviewing these I still -- I can't represent to this Court that I know what they are or are not.  I don't have anything to put forth to say that they are at this point.  Does that mean, if I had them weeks ago, that I would be giving the same answer right now? I can't swear to that, and that's the best I can do in regards to that.

(Tr. III, 27.)

Moreover, given the great weight of the evidence, including the testimony of Courtney, Blake, Randolph and Adolph, and the absence of any basis on which to conclude that the late-disclosed evidence had an impact on Petitioner's defense, there is no reasonable probability that the outcome of the trial would have been different.

Finally, *Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose. *See U.S. v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994). It is clear that Petitioner and his trial counsel received and reviewed the information and, in consultation with David McIntee's counsel, determined that there was no theory or basis upon which they might argue that the late-disclosed evidence was exculpatory or could have been used for impeachment. Accordingly, Petitioner's claim regarding an alleged *Brady* violation is without merit.

IV.    Ineffective Assistance of Trial Counsel - Ground 4.

In his fourth ground for relief Petitioner claims that his trial attorney was ineffective for not properly impeaching witnesses, failing to move for the disqualification of the trial court judge, and failing to move for a continuance after discovering the suppressed *Brady* information.

Expressly relying on the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), in ruling on Petitioner's motion for relief from judgment, the trial judge concluded that Petitioner's trial counsel was not constitutionally ineffective because

> 'Decisions as to what evidence to present and whether, [and how] to call or questions witnessers are presumed to be matters of trial strategy, [and an appellate court] will not substitute its judgment for that of counsel regarding matters of trial strategy.' *People v. Davis*, 250 Mich App 357, 368-369 (2002) . . . .'

Additionally, the trial judge concluded that because the disqualification issue had been resolved against Petitioner after a hearing, at which Petitioner was represented by counsel, and *de*

*novo* review by the chief judge, trial counsel could not have been ineffective for failing to raise disqualification. Finally, because the trial judge found that the information allegedly withheld by the prosecutor did not influence the outcome of the case, trial counsel's failure to seek a continuance to further investigate the information was not ineffective assistance by trial counsel.

In *Strickland*, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

Petitioner cannot show that he was prejudiced by trial counsel's alleged failure to impeach witnesses, move for the disqualification of the trial court judge, or move for a continuance after discovering the suppressed *Brady* information.

First, with respect to the failure to impeach witnesses claim[4], Plaintiff states that:

In her initial police statement, it is reported that Hazel Jedryczka stated to police she along with Randolph and Adolph went to Courtney and Blake's home where all three of them left in the truck after receiving a call that the house was being broken into. Hazel also stated that when they arrived at the home Randolph and Adolph jumped out of the truck and she stayed back waiting for the police. Hazel stated while she was waiting, she witnessed petitioner coming out of the home. At trial, however, Hazel Jedryczka testified that she stayed back while Randolph and Adolph left on a four-wheeler, and [when] her daughter arrived at the home is when she and her daughter went to the home and when she got there she saw two men on the ground with guns drawn at them.

It is petitioner's contention that his trial lawyer should have explored the police report, and if Hazel Jedryczka's statement to police was indeed made by her, impeach her testimony at trial.

(Second Am. Pet. 20-21, docket #17.)

The state court reasonably determined that trial counsel's decision no to cross-examine was presumptively trial strategy, and Petitioner failed to overcome that presumption. Hazel Jedryczka's testimony was minimal and was offered, mostly, if not entirely, for the purpose of corroborating Courtney's testimony regarding the telephone call she made to Hazel. Even if Petitioner's counsel had confronted Hazel with the statements she allegedly made to the police, Petitioner fails to explain how the inconsistencies between her trial testimony and her statements to the police would have aided his defense. Additionally, Petitioner cannot show prejudice. Even if

---

[4]In the form petition, Petitioner claims that "there were several instances where trial counsel could have impeached several of the prosecution witnesses with their previous inconsistent statements but failed to do so." (Second Am. Pet., docket #17, Page 12.) However, Petitioner does not identify any witnesses at all. In his Amendment to Habeas Claim IV(A) filed concurrently with the form petition, Petitioner argues only that Hazel Jedryczka's statement to the police was inconsistent with her trial testimony. (*See* docket #17, Page 20.) That claim is addressed herein.

- 31 -

Petitioner's counsel had entirely discredited Hazel's testimony, Petitioner fails to explain how that would have affected the outcome in his case, given the ample and consistent testimony of the other witnesses.  Moreover, even assuming that Hazel's trial testimony was different from the statements she made to the police, nothing in either her trial testimony or her statements to the police was inconsistent with testimony provided by other witness regarding the same events.  Even without Hazel's testimony, a jury easily could have convicted Petitioner based on the testimony of the other witnesses.

With respect to Petitioner's claims that his counsel was ineffective for failing to move for the disqualification of the trial court judge, because the trial judge was not biased, counsel could not have been deficient for failing to raise this issue at trial.  Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel.  *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004).  With respect to Petitioner's claim that his counsel was ineffective for failing to move for a continuance after discovering the suppressed *Brady* information, because the allegedly suppressed information was not exculpatory, counsel could not have been deficient for failing to raise this issue at trial.  *See id.*  Petitioner, therefore, is not entitled to habeas corpus relief on his claim of ineffective assistance of counsel.

V.      Resentencing: Ground 5

In his fifth claim for relief, Petitioner alleges that he is entitled to resentencing because the trial court's April 24, 2004, amended sentence was entered without jurisdiction rendering it null and void.  Petitioner contends that because he was originally sentenced on April 1, 2004, and was appointed appellate counsel on April 8, 2004, "which effectuated a claim of appeal,

- 32 -

placing jurisdiction exclusively in the hands of the Michigan Court of Appeals, the April 28, 2004,

resentencing by the trial court was done without jurisdiction."  (Second Am. Pet. 14, docket #17.)

Petitioner first raised this claim in the trial court by way of a motion to supplement

his motion for relief from judgment under MICH. CT. R. 6.502(f).  (*See* docket #45.)  The trial court

rejected this claim, stating as follows:

> The Defendant acknowledges that such an amendment is permissible but not
> mandatory.  MCR 6.502(F).  The Defendant has failed to indicate why he, or
> any of his prior attorneys (appellate or attorney for the disqualification
> motion) failed to raise these issues before.  The Court would summarily
> dismiss this request as this matter has been pending since May 2007, almost
> a year ago, and because it is optional.  Even if the merits of the request were
> considered the Defendant's requests would be denied. . . . [T]he issue of the
> propriety of his sentencing was already affirmed by the Michigan Court of
> appeals.

(4/1/08 Order Den Mot. for Relief from J., docket #47.)

Petitioner fails to raise a meritorious federal claim.  This claim is without merit.

First, it is well-established that habeas review does not extend to questions of state law.  *See Estelle*,

502 U.S. at 67–68 ("Today, we reemphasize that it is not the province of a federal habeas court to

reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885

(9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application

of its own laws.").  "A determination of whether a state court is vested with jurisdiction under state

law is a function of the state courts, not the federal judiciary."  *Wills v. Egeler*, 532 F.2d 1058, 1059

(6th Cir. 1976); *accord Rhode v. Olk–Long*, 84 F.3d 284, 287 (8th Cir. 1996); *Wesselman v.

Seabold*, 834 F.2d 99, 102 (6th Cir. 1988).  As a consequence, the issue is not cognizable on habeas

review.

Second, the amended judgment of sentence merely corrected a clerical error.  The

original judgment of sentence entered April 1, 2004, did not reflect that Petitioner was sentenced

as an habitual offender, however, the parties and the court were all well aware that this was the case. The prosecutor had filed a supplemental information in July, 2003 detailing Petitioner's prior convictions, the presentence report treated Petitioner as an habitual offender detailing each of his prior convictions, and the trial court's original sentence was clearly imposed on the basis of Petitioner being an habitual offender.  Indeed, the trial court's sentence of 21 years, 6 months to 40 years imprisonment on the first-degree home invasion conviction could only have been entered if the trial court sentenced petitioner as an habitual offender.  *See* MICH. COMP. LAWS § 750.110a(5) (providing that first-degree home invasion is a felony punishable by imprisonment for not more than 20 years).

Additionally, until Petitioner filed his motion to supplement in 2008, the entire issue of his habitual-offender status does not appear to have been noticed by anyone but the Michigan Department of Corrections (MDOC).  On April 21, 2004, the Michigan Department of Corrections wrote to the trial court noting that it appeared that Petitioner had been sentenced as an habitual offender, but the judgment of conviction did not reflect this fact.  (4/21/2004 Letter from MDOC, docket #52.)  As a result, the MDOC requested that the trial court clarify Petitioner's status for purposes of "this prisoner's time computation and classification" and requested that the trial court submit an amended judgment if Petitioner had, in fact, been sentenced as an habitual offender.  (*Id.*) In response to the MDOC's letter, the trial court sent an amended judgment of sentence reflecting that Petitioner had been sentenced as an habitual offender.  The amended judgment of sentence did not in any way alter the sentence imposed on petitioner in the trial court's oral pronouncement of sentence or the original written judgment of sentence.  (*See* Sentencing Tr., docket# 39; 4/2/08 Judgment of Sentence, docket# 52.)  It merely corrected what was obvious to all involved but what had been omitted from the original written judgment of sentence - namely, that Petitioner was

sentenced as an habitual offender. *See Robertson v. McKee*, No. 2:09-CV-14675, 2011 WL 7112235, at *12 (E.D. Mich. June 20, 2011 (finding clerical error where trial court merely omitted the fact that petitioner had been sentenced as an habitual offender); *see also McMannis v. Eberlin*, No. 5:07–CV–255, 2007 WL 3129738, at *2 (N.D. Ohio Sept. 6, 2007); *Wray v. Ward*, No. 03–CV–067, 2007 WL 1822388, at *5 (N.D. Okla. June 22, 2007). Accordingly, even if Petitioner's claim were cognizable in this proceeding, Petitioner would not be entitled to relief.

      VI.    Ineffective Assistance of Appellate Counsel: Ground 6

      Petitioner claims that his appellate counsel was ineffective for failing to raise on appeal claims II through V that Petitioner raises here.

      An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* Because Petitioner's claims II through V are meritless, his appellate counsel could not have been ineffective for failing to raise them on appeal. As noted above, counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith*, 591 F.3d at 523.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated: December 1, 2014                    /s/ Phillip J. Green
                                           Phillip J. Green
                                           United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Branch*, 537 F,3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  General objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).